**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellant,</u>

v.

ROBERT H. SULLIVAN,
<u>Defendant-Appellee.</u>

No. 97-4017

WASHINGTON LEGAL FOUNDATION;
JEFF SESSIONS, United States Senator;
JON KYL, United States Senator;
JOHN ASHCROFT, United States
Senator; STROM THURMOND, United
States Senator,
<u>Amici Curiae.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Robert G. Doumar, Senior District Judge.
(CR-96-339-A)

Argued: December 4, 1997

Decided: March 9, 1998

Before NIEMEYER, Circuit Judge, WILSON,
Chief United States District Judge for the
Western District of Virginia, sitting by designation, and JONES,
United States District Judge for the Western District of Virginia,
sitting by designation.

_____

Reversed and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Chief Judge Wilson and Judge Jones joined.

_____

**COUNSEL**

**ARGUED:** Patty Merkamp Stemler, Chief, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. David Benjamin Smith, ENGLISH & SMITH, Alexandria, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Paul G. Cassell, UNIVERSITY OF UTAH COLLEGE OF LAW, Salt Lake City, Utah; Daniel J. Popeo, Paul D. Kamenar, WASHINGTON LEGAL FOUNDATION, Washington, D.C., for Amici Curiae.

_____

**OPINION**

NIEMEYER, Circuit Judge:

We are presented with the question of whether the defendant's confession, made following a routine traffic stop, and a gun subsequently seized from the defendant's automobile should be suppressed under both the Fourth and Fifth Amendments. The district court granted the defendant's motion to suppress, holding that when the defendant was "subjected . . . to six repeated, insistent questions obviously designed to invite incrimination," he was taken into custody and therefore should have been given Miranda warnings. On the government's interlocutory appeal, we reverse and remand this case for further proceedings.

I

At midday on January 23, 1996, United States Park Police Officer Franz Ferstl stopped a car traveling northbound on the George Washington Memorial Parkway in Virginia because the car was missing its front license plate. After Robert Sullivan, the driver, produced his driver's license and car registration, Officer Ferstl noticed that the missing license plate was displayed on the car's dashboard. The officer then asked Sullivan whether he had any outstanding traffic tickets in Virginia. With that question, Sullivan's demeanor changed noticeably. He responded that he believed he owed $30 on a ticket he had

2

received for making an illegal u-turn. Suspecting that Sullivan's license may have been suspended, Officer Ferstl returned to his police cruiser in order to run a check on Sullivan's driving record. Since the Park Police computer was "down" at the time, Ferstl requested assistance from the Airport Police at nearby Washington National Airport. Between five and ten minutes later, Airport Police Officer Roscoe Evans arrived on the scene and ran the check on Sullivan's license and registration. The computer check took less than five minutes to complete and came up negative. After Ferstl indicated that he had the situation under control, Evans departed the scene. Officer Ferstl then returned to Sullivan's car, handed Sullivan his license and registration, and advised Sullivan to take care of the unpaid ticket and replace the missing license plate. The traffic stop at this point had lasted approximately 15 to 20 minutes.

When Sullivan's driving record appeared clean, Officer Ferstl suspected that "there [was] something else wrong here." Accordingly, after returning Sullivan's license and registration, Ferstl asked Sullivan "if he had anything illegal in the vehicle." Sullivan hesitated before responding, and Ferstl noticed that his lip"started to shake and quiver." Sullivan then responded, "illegal?!" with his "tone raised." Becoming more suspicious, Ferstl repeated the question. This time, instead of answering, Sullivan only "turned his head forward and looked straight ahead." Ferstl then told Sullivan that "if he had anything illegal in the vehicle, it's better to tell me now." When Sullivan still did not answer, Ferstl again asked him what he had in the car and told him that "he could tell me . . . . I would be cool with him." After Ferstl asked Sullivan another time what was in the car, Sullivan finally replied, "I have a gun." Ferstl then asked Sullivan where the gun was located, and Sullivan replied, "under the seat." This dialogue lasted "probably less than a minute."

Following Sullivan's statement, Officer Ferstl ordered Sullivan to place his hands on the steering wheel of the car, thanked him for his cooperation, and requested backup. Once additional police officers, including Officer Evans, arrived, Ferstl ordered Sullivan out of his vehicle and handcuffed him. Ferstl then recovered a Browning 9mm pistol loaded with 14 rounds of ammunition from under the driver's seat of the car. The officers advised Sullivan that he was under arrest and later released him with a citation, charging him with illegal pos-

3

session of a handgun. It is undisputed that at no time during the encounter did Officer Ferstl advise Sullivan of his Miranda rights, nor did he ever inform Sullivan that he was free to leave.

After the government discovered that Sullivan had previously been convicted for armed robbery, the grand jury indicted him with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Prior to trial, Sullivan moved to suppress both his confession and the gun on the grounds that the confession was involuntary and had been obtained in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The government argued in opposition that, when Sullivan was being questioned by Officer Ferstl, he was not "in custody" for purposes of Miranda and that his confession had been voluntarily made.

The district court granted Sullivan's motion to suppress. 948 F. Supp. 549, 558 (E.D. Va. 1996). It pointed out that Officer Ferstl's questions concerned "a matter wholly unrelated to the reasons for the traffic stop." Id. at 550. The court therefore stated the issue as "whether Officer Ferstl's repeated questioning regarding matters outside the scope of the circumstances leading to the traffic stop amounted to a custodial interrogation." Id.  Relying on Berkemer v. McCarty, 468 U.S. 420 (1984), the district court found that "an objectively reasonable person in the defendant's place would not have felt that he could leave prior to the sixth question. Therefore, for purposes of Miranda, the defendant was `in custody.'" 948 F. Supp. at 557-58. The court accordingly concluded that Sullivan's confession and its fruits "must be suppressed." Id. at 558.

The government noticed an interlocutory appeal, see 18 U.S.C. § 3731, and Sullivan's trial on the charges was postponed pending the outcome.

II

In the district court, Sullivan based his suppression motion on the alleged denial of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), in which the Supreme Court imposed procedural duties on government officials to protect the Fifth Amendment rights of persons during custodial interrogations. During oral argument, however, it

4

appears that Sullivan may also have argued Fourth Amendment principles, urging that he had been illegally seized when the purpose of the traffic stop had ended and the police officer continued to question him on matters unrelated to the stop. On appeal, Sullivan clearly relies on both Fourth and Fifth Amendment grounds to support the district court's suppression order.

While the district court conducted its analysis under both the Fourth and Fifth Amendments, it rested its suppression order on the failure to give Sullivan his <u>Miranda</u> warnings. Thus, before conducting our review, it will be useful to outline the applicability of Fourth and Fifth Amendment principles to traffic stops.

In order to protect the rights granted by the Fifth Amendment that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, the Supreme Court in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), adopted prophylactic procedural rules that must be followed during custodial interrogations. The Court held that a suspect in custody "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Id.</u> at 444. Any statements elicited from a suspect in violation of these rules are inadmissible in the prosecution's case-in-chief. <u>See United States v. Leshuk</u>, 65 F.3d 1105, 1108 (4th Cir. 1995) (citing <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (per curiam)).

The procedural safeguards prescribed by <u>Miranda</u> apply "only where there has been such a restriction on a person's freedom as to render him `in custody.'" <u>Stansbury</u>, 511 U.S. at 322 (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (per curiam)). A person is "in custody" for purposes of <u>Miranda</u> either if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest. <u>Id.</u>; <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984); <u>Leshuk</u>, 65 F.3d at 1108.

Addressing whether traffic stops implicate the requirements of <u>Miranda</u>, the Supreme Court in <u>Berkemer</u> observed that even though "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they

5

might do so," 468 U.S. at 436, "persons temporarily detained pursuant to [ordinary traffic] stops are not `in custody' for the purposes of Miranda," id. at 440. Only if the motorist is detained "to a `degree associated with formal arrest'" will he be entitled to the Miranda protections for in-custody interrogations. Id. (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). In short, while a motorist during a routine traffic stop is detained and not free to leave, the motorist is not "in custody" for Miranda purposes.

The "custody" that implicates the Miranda rule is conceptually distinct from a seizure implicating the Fourth Amendment. The Fourth Amendment secures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable . . . seizures." U.S. Const. amend. IV. Even though a routine traffic stop does not amount to a custodial detention of the motorist, it does constitute a "seizure" within the meaning of the Fourth Amendment. See Delaware v. Prouse, 440 U.S. 648, 653 (1979). The usual traffic stop, however, is more analogous to a "so called `Terry stop' than to a formal arrest." Berkemer, 468 U.S. at 439; see also United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992) (traffic stop is limited seizure more like investigative detention than custodial arrest). In carrying out a routine traffic stop, a law enforcement officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation. . . . Any further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." Id. at 876-77 (citation omitted). It follows that statements obtained as the product of an illegal detention are inadmissible. See Florida v. Royer, 460 U.S. 491, 501 (1983).

But police encounters with citizens during which police question them are, without more, consensual. "[M]ere police questioning does not constitute a seizure" for Fourth Amendment purposes. Florida v. Bostick, 501 U.S. 429, 434 (1991). Rather, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred." Id. (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). In the absence of a seizure, a police-citizen encounter is considered consensual and "will not trigger Fourth Amendment scrutiny." Id.

6

At bottom, a routine traffic stop does not place the motorist in custody so as to require <u>Miranda</u> warnings. Such stops are analogous to <u>Terry</u> stops where no <u>Miranda</u> warnings are required. <u>Miranda</u> warnings are required only when the motorist is detained to an extent analogous to an arrest. But a routine traffic stop <u>does</u> constitute a Fourth Amendment seizure so that when the purpose justifying the stop is exceeded, the detention becomes illegal unless a reasonable suspicion of some other crime exists. When the stop is over and its purpose served, however, mere questioning by officers, without some indicated restraint, does not amount either to custody for <u>Miranda</u> purposes or a seizure under the Fourth Amendment.

Against these principles, Sullivan contends that his confession must be suppressed (1) because it was made by him while he was in custody without having received <u>Miranda</u> warnings, and alternatively (2) because it was given while he was being detained beyond the scope of his traffic stop in violation of the Fourth Amendment.

In reviewing the district court's determination on these issues, we defer to the district court's factual findings about the circumstances surrounding the interrogation, reviewing only for clear error. But on the question of whether those circumstances create a custodial situation requiring <u>Miranda</u> warnings or constitute a seizure implicating the Fourth Amendment, we review <u>de novo</u>. <u>See Thompson v. Keohane</u>, 116 S. Ct. 457, 465 (1995); <u>United States v. Howard</u>, 115 F.3d 1151, 1154 (4th Cir. 1997); <u>United States v. McDonald</u>, 61 F.3d 248, 254 (4th Cir. 1995).

With these principles in hand, we now turn our attention to the facts of this case.

III

The facts relevant to whether Sullivan was "in custody" are readily summarized. Following the traffic stop and after its purpose had been served, Officer Ferstl, prompted by a lingering suspicion that something was amiss, asked Sullivan whether he had anything illegal in the car. When Sullivan would not directly answer the question, the officer repeated it several times. During the course of the dialogue, which lasted less than a minute, the officer advised Sullivan that it would be

better "to tell me now" and that he "would be cool" with Sullivan. The questions culminated with Sullivan's admission that he had a gun under the front seat.

This conversation included no threats or statements that Sullivan was being detained, and it occurred at midday on the side of a highway in full public view. See Berkemer, 468 U.S. at 438 (exposure to public scrutiny diminishes motorist's fear of abuse by police). There is no hint from anything Officer Ferstl said or from how he conducted himself to suggest that Sullivan was under arrest or was being detained as if he were under arrest. The officer had returned Sullivan's license and registration to him before questioning him. The mere fact that Ferstl did not affirmatively advise Sullivan that he could refuse to answer Ferstl's questions or that he was free to go did not transform the encounter into a custodial interrogation. See Leshuk, 65 F.3d at 1110. Even "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes." Id. at 1109-10. While we accept the factual findings made by the district court in this case -- which, we note, Sullivan also does not challenge -- we conclude as a matter of law that Sullivan was not in custody for purposes of Miranda while being questioned by Ferstl.

IV

Sullivan argues alternatively that he was detained in violation of his Fourth Amendment right against unreasonable seizures and that his statement was made during an illegal detention. He argues, citing Florida v. Royer, 460 U.S. 491, 501 (1983) ("[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will."), that his confession must therefore be suppressed. Sullivan maintains that Officer Ferstl's interrogation about contraband had "no connection with the alleged reason for the traffic stop" and notes that the government has conceded the absence of a reasonable suspicion of any crime to justify a Terry stop upon completion of the traffic stop.

The government argues that at the time Officer Ferstl questioned Sullivan about illegal contraband, the traffic stop had ended and Offi-

8

cer Ferstl had returned Sullivan's license and registration. Accordingly, the government maintains that the ensuing dialogue between Sullivan and Officer Ferstl was consensual.

As we have noted, because a routine traffic stop amounts to a seizure implicating the Fourth Amendment, albeit a limited seizure analogous to a Terry stop, "if the initial stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the `fruit of the poisonous tree doctrine.'" United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). No party, however, has advanced the argument that the initial stop in this case was illegal. Sullivan argues, rather, that Officer Ferstl's questioning after the completion of the traffic stop amounted to a detention and, because it was imposed without reasonable suspicion, violated Sullivan's Fourth Amendment rights.

The test we apply in determining whether a person has been seized for purposes of the Fourth Amendment is whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect's position "would have felt free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 438 (1991); United States v. Lattimore, 87 F.3d 647, 653 (4th Cir. 1996) (en banc); see also United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989) ("[So] long as a person remains at liberty to disregard a police officer's request for information, no constitutional interest is implicated." (quoting United States v. Black, 675 F.2d 129, 134 (7th Cir. 1982))). Because the test is an objective one, its proper application is a question of law. See McDonald, 61 F.3d at 254.

In this case, the district court found that Officer Ferstl's "six repeated, insistent questions" amounted to a detention since "an objectively reasonable person in the defendant's place would not have felt that he could leave" prior to the question that elicited Sullivan's confession. Although the district court's conclusion was reached in the context of a custody determination under Miranda, Sullivan argues that it also "provide[s] a clear basis for ordering suppression under the Fourth Amendment." Even if we assume that the district court's Miranda ruling may be used as a basis for concluding that a Fourth Amendment seizure occurred, we nevertheless disagree that

9

the brief one-minute dialogue between Officer Ferstl and Sullivan, when viewed objectively, amounted to a seizure implicating the Fourth Amendment. Our decisions in United States v. Lattimore, 87 F.3d 647 (4th Cir. 1996) (en banc), and United States v. Rusher, 966 F.2d 868 (4th Cir. 1992), support this conclusion.

In Lattimore, we held that no Fourth Amendment violation occurred in circumstances very similar to this case. After the defendant had been pulled over for speeding, he accompanied the police officer to the patrol car, where the officer issued the defendant a warning for speeding and a ticket for failing to wear his seat belt. After handing the citations to the defendant and returning the defendant's driver's licence, the officer asked the defendant whether there were any drugs or other contraband in his car. When the defendant responded in the negative, the officer requested and received the defendant's consent to search the car. That search uncovered cocaine and narcotics paraphernalia. Among the issues addressed in Lattimore was whether the officer's initial questions concerning the contents of the defendant's car "exceeded the lawful scope of the traffic stop and thereby converted the encounter into an illegal detention." 87 F.3d at 652. Applying the test set forth by the Supreme Court in Bostick, we held that the totality of the circumstances surrounding the encounter indicated that the encounter was consensual. Id. at 653. To reach this conclusion, we noted that the officer did not question the defendant "until after the officer had issued the citations and returned [the defendant's] driver's license." Id.

Similarly, in Rusher, we found no Fourth Amendment violation where, following the completion of a routine traffic stop prompted by the defendant's driving without a valid licence plate, the police officer asked the defendant whether he possessed any illegal contraband. As in Lattimore, after being pulled over the defendant accompanied the officer to the patrol car, where the officer issued the defendant a citation. After returning the defendant's driver's license and informing him that he was "free to go," the officer asked the defendant whether there were "any weapons, illegal contraband, alcohol or anything of an illegal nature in the vehicle." 966 F.2d at 872. After the defendant stated that there were not, he consented to a search of his car. This search uncovered drugs and drug paraphernalia. In addressing the issue relevant here, whether the officer's initial question about contra-

10

band "exceeded the proper scope of the traffic stop," id. at 876, we concluded that it did not because the encounter was consensual, id. at 877.

In the case before us, we likewise conclude that the brief dialogue between Officer Ferstl and Sullivan was consensual. Sullivan remained in his own car throughout the dialogue. Ferstl did not question Sullivan until after he had returned Sullivan's license and registration, thus ending the traffic stop and affording Sullivan the right to depart. Significantly, there is no indication that Ferstl employed any physical force or engaged in any outward displays of authority that indicated that Ferstl was detaining Sullivan. While Ferstl never told Sullivan that he was free to go, that fact alone is not dispositive. See Ohio v. Robinette, 117 S. Ct. 417, 421 (1996) (Fourth Amendment does not require police officers executing traffic stops to inform motorists that they are free to go before engaging in consensual interrogation). Moreover, the repetition of questions, interspersed with coaxing, was prompted solely because Sullivan had not responded. They encouraged an answer, but did not demand one. We cannot conclude that this limited coaxing with the repetition of questions amounts to a Fourth Amendment seizure.

Because we hold that the brief interrogation of Sullivan did not constitute a seizure within the meaning of the Fourth Amendment, it follows that any statement made by Sullivan during this dialogue was not illegally obtained.

For the foregoing reasons, we reverse the district court's order suppressing Sullivan's confession and the gun found in the car and remand this case to the district court for further proceedings.*

REVERSED AND REMANDED
_____

*Amici curiae urge that we reverse the district court on the basis of 18 U.S.C. § 3501 (providing for the admissibility of confessions voluntarily given). Because our decision moots this issue and because the parties neither presented it to the district court nor briefed it on appeal, we decline to address it.

11